All right, the last case before the court today is Case Number 14-1363, In Re Inventor Holdings, LLC. Mr. Fahmy, is that how you pronounce it? Yes, Your Honor, that's right. Do you want five minutes for rebuttal? Please. All right, you may begin. Thank you, Your Honor. May it please the court, my name is Tarek Fahmy and I'm here representing Inventor Holdings. Your Honor, the board's decision should be reversed because it's based on an impermissibly broad construction of the claims. When read and understood by the person of ordinary skill in the art, the claims require a single data processing apparatus or integrated display device and RIMR teaches no such device. In rejecting the claims, the board did not contradict this conclusion. Instead, the board relied upon a construction of the claims based upon a dictionary definition for the term apparatus and decided that the plain meaning of that dictionary definition did not preclude the use of multiple materials or equipment. This is the board's decision at page 5. But because the board's position is insupportable under the law, this issue should be resolved in the patent owner's favor and the board's decision should be reversed. As this court knows, the broadest reasonable interpretation is more of a protocol than a rule of claim construction and it's not a protocol that permits any reading of a claim. In fact, it's not a protocol, for example, that would permit a legally incorrect interpretation of a claim. And even under the broadest reasonable interpretation, examiners must still provide some evidence that their interpretation is reasonable in some manner. Now the claim at issue here, Claim 7, which is representative, recites a data processing apparatus. That data processing apparatus has certain constituents and it was the testimony of Dr. Wolf during the reexamination proceeding that it was clear to the person of ordinary skill in the art, based upon specification and the reading of the claim itself, that what's described is a single device that performs the steps of the claim. But don't most of the claims actually involve multiple devices? Some do, Your Honor. Some involve a pair of devices. The server, for example, and the television receiver or integrated display device. Now in those claims, the elements are actually called out separately. But what we're talking about here is the single device that performs the steps of receiving the request for the supplemental information, receiving the synchronization information itself, processing that request and actually performing the synchronization, and then providing the synchronized supplemental information so that it appears in the correct context with whatever it is the viewer happens to be watching. But where do you point in the intrinsic record that you think actually really limits that data processing apparatus to the single integrated device? So we have four areas in the record that we've pointed to, Your Honor. We start with the claim itself. And we reference Dr. Wolf's testimony. This appears at AX501, where Dr. Wolf, after having reviewed both the patent and the claim itself, concludes that from the standpoint of the person of ordinary skill in the art, the claim is quite specific as to how and where the synchronization process is performed. The readers advise that the process is performed by a certain data processing apparatus that includes the constituents and that it is the same apparatus that contains the program executed by the CPU for processing the request for the supplemental information and providing the same. Dr. Wolf concludes this by saying that in the context of disclosure of the Walker patent, then, it's clear to the person of ordinary skill in the art that the claim is reciting a single device. Now, within the patent itself, there are three embodiments disclosed that recite this single device. In column seven, you'll find the server embodiment disclosed. And in column 10, there are two additional embodiments, one being the single PC embodiment and one being the integrated display device embodiment. Each of those recite the single device with the informed constituents that perform all of the steps of claim seven. You know, you said earlier that the broadest reasonable construction is not really a rule of construction, but it's a protocol, I think you said, or procedural device. But it performs an important service, correct? I mean, it's a way of establishing with some degree of certainty the scope of the claim dimension so that when the case gets litigated or is pressed outside of the PTO, people understand that the broader interpretation that the PTO wants to preclude is not going to be asserted against prospective possible infringers. So why not simply say, at least as a starter to say, an apparatus consisting of a single integrated device? Why not add that to your claims? And then maybe that would satisfy the examiner, maybe not. But what's the problem with doing that? Well, there's no particular problem in doing that, Your Honor. We don't disagree that the… Well, that would have been a lot less troublesome and expensive, I guess, than coming up here, right? Perhaps it would have been, Your Honor. I don't understand. I mean, whenever I see a case like this, when it would seem to have been so simple to solve the problem, I'm left with the feeling that there's another reason that the party is pressing the broader construction and is unwilling to consent to a narrowing, even though the party is saying that narrowing is exactly what my invention is. Well, in fact, we are saying the narrowing is what the invention is. Then why don't you say it to the examiner and put it in the claims? I think we did. Well, no, but why don't you put it in terms such as that I just read? Why wouldn't that solve your problem? Or at least if it didn't, then you'd know how much farther you had to go to satisfy the examiner. Well, I think with respect, the claim actually already says that. Well, I know you think that, but the examiner didn't think it and the board didn't think it, and isn't it easier simply to acquiesce, even though you don't think it's right, and say, okay, this doesn't hurt us because this is exactly what our invention is. We'll put it in the claim. Why not? I guess I would suggest that it wasn't necessary. By using the singular term A in the claim, we've already limited the claim to the single device. This course addressed these same issues, for example, in the power integrations case. In power integrations, the court was confronted with circumstances about whether the district court properly interpreted a claim term. In that case, it was the frequency variation signal to include certain elements that were not expressly recited in the claim. In particular, it was whether the term frequency variation signal meant a cyclical nature. The court had no problem in concluding that such was already included in the claim because that's the only embodiment that were described in the specification. It was clear from viewing the claim through the lens of the specification that that could be the only reasonable interpretation. A similar result was reached. That wasn't the broadest reasonable construction or broadest reasonable interpretation that was being applied, was it? I agree it was not, Your Honor, because it was a district court, but frankly, the result would have been no different under the broadest reasonable interpretation. This court found that very thing in Succo Surface. Succo Surface was a case exactly like this one arising out of an ex parte reexamination where the broadest reasonable construction had been applied. The board wished to read the claim element at issue there, the finishing material broadly so that it could be any layer within this floor surface. This court found that that was improper because all of the embodiments disclosed in the specification required that it be the last layer. Even under a broadest reasonable interpretation where the board's construction goes beyond that which the inventor actually invented as disclosed by the specification, that interpretation becomes unreasonable. That's the situation here. The board, like the examiner before it, did not start with the intrinsic record, did not start with the specification. The examiner went immediately to a dictionary definition, and when the examiner pulled that definition, he pulled it from a dictionary that was current 15 years after the filing date of the very patented issue. Now the board corrected that problem and found a different dictionary contemporaneous with the patent filing date. However, they offered no analysis as to why the selected definition from the dictionary was the correct one from the standpoint of the person of ordinary skill of New York. In the board's opinion, they preface... Don't we assume that inventors use ordinary language ordinarily unless they expressly tell us to the contrary? That's correct, Your Honor, and in this case... So we sort of assume that everybody uses Webster's? Well, I'm not sure if Webster's... Whatever, I mean, you know what I'm talking about. So is there anything in this patent that gives express definition over and above the dictionary definition? I would suggest that it's all of the examples that are given by the inventors when they are discussing this apparatus in the specification. They all recite or all explain the single device nature. Now go back, you mentioned column 7 earlier. Yes, Your Honor. You didn't tell me which lines. Oh, I beg your pardon. So in column 7... And column 10 you also mentioned. Which lines make it clear that it's a single device? Let me pull those for you, Your Honor. I'm looking at appendix 1151, but the patent may be elsewhere. Yes, so I can invite your attention to column 10, lines 10 through 14. This is at appendix 1152. In this embodiment, the integrated display device would execute a standalone computer application designed to synchronize and display the supplemental information. But the claim is not necessarily limited to that embodiment. What about column 7? You cited that also? Yes, in column 7... I believe the server is discussed and it's with reference to figure 1. I'm sorry, line 17, referring to utilizing a personal... My apologies, I didn't have it at my fingertips, Your Honor. So in column 7... A functional computer includes a CPU 41 and a storage device 42. Is that what you're talking about? No, actually what I'm referring to, Your Honor, is the discussion of the server. And the server discussion begins at about line 53 or so. The website server first accesses the particular supplemental information. It goes on and says that the website server performs a synchronization based upon the synchronization information, et cetera. Those are the steps that are recited in claim 7. And so that is what it's performing. It's known as a single device. The figure that it's referenced to shows that it is a single server device that includes all these constituents, Your Honor. That's all figure 1? Correct. It's the upper right-hand element in figure 1. So this is server element 70. You see that it contains the recited CPU 71, storage device 73. I have a question for you, and this is not in your brief, but it's confusing to me. It appears that the examiner previously considered Rymer. Correct, Your Honor. And that the examiner actually found that the claims were patentable over Rymer, addressing some of the exact same questions that are presented here. That's correct, Your Honor. So how is this a substantial new question of patentability?  However, the SNQ question was not before the board, as that would have properly, I believe, been a matter for petition rather than appeal. And therefore, it was not something reviewable by appeal. Okay. But did you present it? Did you even make that argument below? We made the argument, I believe, in response to the examiner's first office action, but I believe that's about as far as it was pursued. The examiner felt that the SNQ standard provided the justification for reviewing the same claims in light of the same art. You didn't pursue the issue? Correct, Your Honor. I believe that takes me to the balance of my time, and I'll reserve the rest for rebuttal unless there are additional questions I can address. Okay. And we'll add two minutes back, so you'll have two and a half minutes. Thank you, Your Honor. Good morning. Please support. I think it's useful to look back at what the thrust of the invention was at the time the application was filed. And at that time, the inventor was very clear that the innovation that was being provided by this patent had nothing to do with it being in a single device or some streamlined and some functional way for purposes of obtaining the patent. What the applicant said was unique about this particular invention is it was the first time that systems provided supplemental information about video programs synchronized with the actions and the events of that program. And it's for that reason, because the thrust of the invention was the synchronization portion, there's no discussion of the specification, not even one mention in the specification of the term data processing apparatus. The term was not only not defined in the specification, it wasn't even mentioned in the specification. It isn't until we're here before, or the patent holder is before the patent office on reexamination, that they focus only in view of the prior art reference on this issue of how many devices, what does a device mean, what does a apparatus mean, and so forth. Does data processing apparatus have any meaning in the electric arts? No, Your Honor, data processing apparatus is not a defined term. I mean, any apparatus that processes data, including a calculator, theoretically, would be a data processing apparatus. That's where I was getting at. I mean, if you say to somebody out at Apple, a data processing device, do they know what you're talking about? Maybe I'm not answering your question, but I guess there would be potentially an infinite number of devices that would qualify as a data processing apparatus if it processed data. So, if the applicant wanted to have... Something that had multiple parts would easily be understood to be a data processing device. Correct. And I think it's clear that if the inventor wanted to limit his apparatus in some way, then, of course, he could have chosen to do so. Yet, if you look at each and every one of the claims, including the claims that were amended and added during reexamination, the language is always used that the various apparatus or system comprises various devices. And the obvious reason why they use this special terminology that is used within the patent parlance is because they don't want to be limited. They don't want to exclude devices because that would obviously be very damning to them from an infringement perspective. It's a little late now. They've created a lot of prosecution history that would limit them, wouldn't you think, even if they win this case? Yes, Your Honor. I do believe that, and I don't know the history of the litigation under this patent. In order to save the patent, they read it very narrowly. Yes, that's correct, Your Honor. Who polices new matters for purposes of having reexams? Substantial new question of patentability. Who's the traffic cop? For example, here, Reimer was in front of the original examiner. The original examiner looked at Reimer and said, Reimer doesn't get in your way. You get a patent, right? Right. So the relevance of Reimer to the issuance of the patent has been determined by the original examiner. The purpose of reexam is not to go back to that question, right? Well, I think the precedent in this court is clear that you can go back to prior art that was considered, as long as there's a new question, a new issue presented. And I think the reason why Reimer… What is the new issue that was presented? Well, I think the new… The difference from what the original examiner was looking at. Well, I think a cursory review of Reimer might lead one to the conclusion that it's a query-based system. In other words, unlike the patent… The original examiner might have made a mistake. Correct. Or he might have found that other… But, I mean, is the purpose of reexam to correct that mistake? Let's assume that the examiner made a mistake and they should have said, oh, my goodness, Reimer is a problem. But the original examiner didn't. I'm just trying to figure out who the cop is because the patent office doesn't particularly care, right, if in reexam you have a reexam even though there's no substantial new question of patentability. Well, I think what matters is not whether the art is the same, but whether the question for the office is the same. And I do think that the court was clear in Etter that, essentially, you are going back in time and correcting mistakes. I mean, the whole purpose of reexamination is to evaluate the administrative process. But specifically, you're not supposed to just correct an examiner's mistakes. You're supposed to correct the absence of consideration of an item, not to go back and redo the same thing again. Well, in all candor, the question of how Reimer was considered in the original prosecution and the overlapping issues with the case today are not in the record. And I don't know how to answer that question for you. Well, this isn't your answer to my question of who's the traffic cop. It's the applicant in the case of a reexam, the patentee. So if the patentee wanted to complain about the fact that there shouldn't have been a reexam in here, they should have made that complaint? Correct. But the patent office itself doesn't have an ombudsman. They don't think they care. Well, I do think they care. And I do think that they're looking for a substantial new question. And that issue is going to be raised. So is the board aware here that Reimer had been in front of the original examiner? Well, it's on the face of the patent. So I think one can assume that they were aware of this question. And I agree with you that it would be the applicant's responsibility, if they felt like there was some procedural error, to raise that as part of the appeal here. The obviousness rejection on Claim 14, what is the basis for closing the gap there? Well, I guess Claim 14 is referring to simply verifying that synchronization is happening. And I think that the best example of where that is happening is with the show option in Reimer. And it's during that show option that the invention in the Reimer patent is discussed as anticipatory buffering and smooth scrolling and synchronization. So I think it is implicit in the discussion and the whole invention in Reimer that if you're going to have scrolling information playing synchronized with the video, that at some point you're going to need to take steps to ensure that the script is not getting so far away from the time code in the video that you're watching. Well, I mean, clearly it didn't use anticipation there. So you're not saying it's actually there. You're saying that, what, it's common sense? Well, I mean, I think it is there in different words, and that's why the examiner decided to make an obviousness rejection as opposed to an anticipation rejection. It's a single reference obviousness rejection, correct? Well... Unlike all the rest. This was Reimer alone, if I understand it. Yes, that's correct, Your Honor. That's correct. So I think the examiner felt that a small leap needed to be made from the teaching and the prior art reference to the claim and decided to make that an obviousness rejection rather than anticipation. But I guess what I'm trying to figure out is what is the leap? How is the leap made? Oh, well, I think the examiner presented the rationale that in order to ensure that the synchronization is maintained between the information being presented and the video playing, that one would want to check that the synchronization was being maintained at certain... So it's just a common sense leap? I don't know if they used the word common sense, but I do think that there would be a motivation to want to ensure that... But they don't cite any other art that would make the leap. They do not. In that instance, they do not. But as I said, the fact that within Reimer itself there's discussion of buffering and enablement of smooth scrolling and synchronization is almost the expressed teaching of that claim in slightly different words. The language that the examiner uses at 8689, I guess it is, is that such a verification step provides a means to ensure that what is intended to occur is indeed successful, thereby increasing the overall efficiency of the device. That's what you're talking about? Yes, Your Honor, that was the explicit discussion of the examiner on this point. If the Court has no more questions. No, thank you. That concludes the argument. Thank you very much. Your Honor, it bears noting that broadest reasonable interpretation standing alone is not the correct standard for the construction of the claims in this case. In fact, the correct standard is the broadest reasonable interpretation consistent with the specification. Exactly, Judge Bryson. And this Court has said so in many cases, including in American Academy of Science and Technology Center. The examiner's original construction of data processing apparatus did not follow this directive. The examiner started and stopped with the dictionary definition, and it was the wrong dictionary, in fact. Although the Board corrected the error in which dictionary was being used, the Board likewise started and stopped with the dictionary definition, providing no insight into why they chose that particular definition from that particular dictionary. In fact, the Board's opinion itself suggests that other definitions were available. They prefaced their recited definition with 1A, indicating that there was probably a 1B and perhaps a 2 and a 3. We're all familiar with the fact that English words have many definitions, and it's the definition that would be apparent to the person of ordinary skill in the art that would matter in this case. The Board's analysis doesn't account for that. It's only Dr. Wolfe's testimony that accounts for the perspective of the person of ordinary skill in the art. When confronted with that question in the investigation, Dr. Wolfe concluded that the claim would recite a single device. Because the Board's construction… Did Dr. Wolfe rely on anything other than his own assertion? He did not cite anything other than his own experience. He didn't cite his treatises or information that's freely available in the field of art? No, it was his own experience in the art, along with his reading of the Walker Patent. And that being the only evidence, the Board's conclusions should be reversed or at a minimum remanded for further consideration. Thank you. Thank you for being submitted.